David Michaels
11 Vincentian Drive #1288
Niagara University NY 14109
Tel: (716) 579-7021
M: (416) 239-1361
david@davidmichaels.org

*Pro Se/*
*Counterclaim Defendant David Michaels*

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID MICHAELS,<br><br>      *Plaintiff*,<br><br> v.<br><br>UNITOP SP. Z.O.O.,<br><br>      *Defendant*. | Case No: 1:16-cv-01015-LJV-JJM<br><br><br><br>**PLAINTIFF'S /<br>COUNTERDEFENDANT'S<br>MEMORANDUM OF LAW<br>SUBJECT MATTER<br>JURISDICTION** |
| UNITOP SP. Z.O.O.,<br><br>      *Counterclaimant*,<br><br> v.<br><br>DAVID MICHAELS,<br><br>      *Counterdefendant*. | |

Michaels submits the following reply brief on subject matter jurisdiction in response to the court's order in Doc 97 and Mr. Levine's amicus brief in Doc 101 "the Amicus brief" regarding why the court's tentative conclusion is erroneous.

Michaels adopts the bulk of the Amicus brief with the following factual corrections and additions:

1.        Regarding the citation of Michaels' claim that page 3 of the Amicus brief:

The reference to Sec. 1111 is to trademarks certified by the USPTO and mark owners suing under Sec. 1125(d) while reference to Sec. 1114 is to domain name registrants for their separate remedy under 1114(2)(D)(iv) or (v). In this case, Michaels asserts a claim under clause (iv).

Michaels asserts a claim under subclauses 1114(2)(D)(iv) and (v) [see Doc No. 1, page 2 (paragraph 2), page 17 (paragraph B), and page 18 (paragraph G)].

2.        Regarding the venue of the Mutual Jurisdiction, page 2 of the Amicus brief erroneously states that: "Mutual jurisdiction is defined in the UDRP as being either the location of the registrar or the registrants business address."

The UDRP rules actually state that:

**Mutual Jurisdiction** means a court jurisdiction at the location of either (a) the principal office of the Registrar (provided the domain-name holder has submitted in its Registration Agreement to that jurisdiction for court adjudication of disputes concerning or arising from the use of the domain name) or (b) the domain-name holder's address as

shown for the registration of the domain name in Registrar's Whois database at the time

the complaint is submitted to the Provider.

See Doc. No. 103-4, pages 2 and 8 of the UDRP rules.


3.          In Storey v Cello Holdings, L.L.C, 347 F3d 370 [2d Cir 2003], the Second

Circuit wrote:

> CONCLUSION
>
> For the reasons given above, we hold that (1) there is subject matter jurisdiction over
>
> Storey's claim against Cello under § 1114(2)(D)(v); (2) the Southern District of New
>
> York was an appropriate venue for Storey's claim; (3)....
>
> Accordingly, we VACATE the judgment of the district court and REMAND for further
>
> proceedings under § 1114(2)(D)(v) to determine whether Storey's registration and use
>
> of the domain name "cello.com" is lawful under the ACPA or whether Cello's
>
> allegations of conduct subsequent to the First Action, the only transactions on which
>
> Cello may premise an ACPA claim not barred by *res judicata,* demonstrate that Storey's
>
> registration and use of "cello.com" are unlawful.
>
> *Storey v Cello Holdings, L.L.C*, 347 F3d 370, 393 [2d Cir 2003]


4.          In Dent v Lotto Sport Italia SpA [D Ariz, Jan. 25, 2021, No.

CV-17-00651-PHX-DMF], where Lotto Sport Italia SpA only owned foreign trademarks, the

court wrote:

Defendant further contends its litigation was reasonable because it prevailed in its case before WIPO. This circumstance may support a parties' argument for litigating a case in federal court under other circumstances, but because a WIPO panelist's decision is entitled to no deference in deciding a claim pursuant to 15 U.S.C. § 1114(2)(D)(v), *Barcelona.com*, *Inc. v. Excelentisimo Ayuntamiento De Barcelona*, 330 F.3d 617, 626 (4th Cir. 2003), Defendant's success in non-binding arbitration with WIPO also does not overcome Defendant's problem with the law of the circuit established in *GoPets*.

> (The Fourth Circuit further observed that "because a UDRP decision is susceptible of being grounded on principles foreign or hostile to American law, the ACPA authorizes reversing a[n arbitration] panel decision if such a result is called for by application of the Lanham Act." *Barcelona.com*, *Inc*., 330 F.3d at 62.")

Defendant further argues that its litigation in this matter was reasonable because it argued that the phrase "under this chapter" in § 1114(2)(D)(2) refers to the Lanham Act as a whole rather than only to the ACPA. (Doc. 116 at 12-13) Defendant concludes that although this Court rejected its argument, the fact that this Court analyzed and discussed the issue establishes that Defendant's defense was reasonable. (*Id*. at 13) In Defendant's motion for summary judgment, it contended that if the phrase were limited to apply only to the ACPA, a cybersquatter acting in bad faith with a claim for RDNH could gain control of an infringing domain name despite having violated the Lanham

Act. (Doc. 83 at 17) However, the evidence in this case clearly does not support such a

circumstance even if this Court had agreed with Defendant's position.

*Dent v Lotto Sport Italia SpA, *17 [D Ariz, Jan. 25, 2021, No. CV-17-00651-PHX-DMF]*

5.          In the Direct Niche, LLC v Via Varejo S/A, 898 F3d 1144 [11th Cir 2018] case:

"On appeal, Direct Niche challenges only the district court's finding that Via Varejo has

used the Casas Bahia mark in commerce in a manner sufficient to establish ownership

rights. After careful review of the record and briefs of the parties, and with the benefit of

oral argument, we affirm." *Direct Niche, LLC v Via Varejo S/A,* 898 F3d 1144, 1146 [11th

Cir 2018]

**Many Other ACPA Cases Against Foreign Mark Owners**

In Sallen v Corinthians Licenciamentos LTDA, 273 F3d 14 [1st Cir 2001], the first circuit wrote

in part III:

Our review of the district court's order dismissing Sallen's complaint for lack of subject

matter jurisdiction is de novo. *Corrada Betances v. Sea-Land Serv. Inc.,* 248 F.3d 40, 44

(1st Cir. 2001). The basic framework for analyzing federal subject matter jurisdiction

has long been settled. Jurisdiction depends upon the facts as they existed when the

complaint was brought. *Mullen v. Torrance,* 22 U.S. (9 Wheat.) 537, 539, 6 L.Ed. 154

(1824). For a federal court to have subject matter jurisdiction over a dispute, a statute

must confer jurisdiction on the federal court and the exercise of jurisdiction must be

consistent with the Constitution. *Osborn v. Bank of the United States,* 22 U.S. (9 Wheat.) 738, 817, 6 L.Ed. 204 (1824).

The federal question jurisdiction statute, 28 U.S.C. § 1331, states that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (1994). In order to determine whether a case arises under federal law, we look at the plaintiff's well-pleaded complaint. *Louisville Nashville R.R. Co. v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908). Sallen's complaint alleges a cause of action under federal law, namely 15 U.S.C. § 1114(2)(D)(v), and so his cause of action arises under federal law for purposes of § 1331.

> This is not a complicated "arising under" case where a plaintiff is potentially using the declaratory judgment remedy to circumvent the well-pleaded complaint rule. Cf. Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). Here, § 1114(2)(D)(v) explicitly provides Sallen with a cause of action so there is no question that Sallen's action arises under federal law for purposes of § 1331.

CL asserts that Sallen's action does not arise under § 1114(2)(D)(v) because he has not provided notice to a "mark owner" as required by the statute and because there is no dispute under the ACPA. CL's argument is without merit. Sallen has clearly stated in his complaint that § 1114(2)(D)(v) is the basis for his requested relief. Whether or not

Sallen can win his claim under § 1114(2)(D)(v) is a separate question which does not

bear on jurisdiction unless Sallen's claim is "wholly insubstantial and frivolous." *Bell v.*

*Hood,* 327 U.S. 678, 682-83, 66 S.Ct. 773, 90 L.Ed. 939 (1946) (holding that

jurisdiction "is not defeated . . . by the possibility that the averments might fail to state a

cause of action on which petitioners could actually recover").

Sallen's claim is not wholly insubstantial and frivolous. Whether CL is a "mark owner"

within the meaning of the statute is in dispute, but it is far from frivolous to argue that it

is. Sallen claims that he gave notice to CL as required by § 1114(2)(D)(v) and CL does

not dispute this. Instead, CL says that it has not registered "Corinthians" as a U.S.

trademark and so Sallen did not provide notice to a "mark owner." CL's interpretation of

"mark owner" is unpersuasive. The ACPA says "mark," not "registered mark," which §

1127 defines separately. Section 1127 defines "mark" to include "any trademark" and

that same section defines "trademark" as "any word, name, symbol, or device . . . (1)

used by a person, or (2) which a person has a bona fide intention to use in commerce

and applies to register on the principal register . . ., to identify and distinguish his or her

goods . . . and to indicate the source of the goods." 15 U.S.C. § 1127. "Mark owner"

must be understood against the backdrop of U.S. trademark law, which provides some

protections to unregistered marks. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529

U.S. 205, 210, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000); *Two Pesos, Inc. v. Taco*

*Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

> As a general matter, there is no principle that all notice provisions are
>
> jurisdictional. Indeed, timely filing of EEOC charges is not jurisdictional in the
>
> area of discrimination law. Zipes v. Trans World Airlines, Inc., 455 U.S. 385,
>
> 392-93, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). In addition, CL does not contest
>
> Sallen's assertion that he provided notice; CL's only claim is that the notice was
>
> not to a "mark owner."

In addition, interpreting "mark owner" to apply only to registered U.S. marks would

create a perverse result at odds with our view of the ACPA as granting relief to

registrants who have wrongly lost domain names in UDRP proceedings. It would be

very odd if Congress, which was well aware of the international nature of trademark

disputes, protected Americans against reverse domain name hijacking only when a

registered American mark owner was doing the hijacking. Such a policy would permit

American citizens, whose domain names are subject to WIPO transfer orders, to get

relief against abusive mark owners that have registered in the U.S., but not against

abusive mark owners that have not registered (including both foreign mark owners and

domestic mark owners that have not registered). It would leave registrants unprotected

against reverse domain name hijackers so long as the hijackers are not registered with

the PTO.

With regard to whether there is a dispute under the ACPA, the text states a "registrant

whose domain name has been suspended, disabled, or transferred under a policy

described under clause (ii)(II) may, upon notice to the mark owner, file a civil action. . .

." 15 U.S.C. § 1114(2)(D)(v). A "policy described under clause (ii)(II)" includes "any action of . . . transferring . . . or . . . canceling a domain name — . . . (II) in the implementation of a reasonable policy by such registrar . . . prohibiting the registration of a domain name that is identical to, confusingly similar to, or dilutive of another's mark." *Id.* § 1114(2)(D)(ii)(II). It is undisputed that Sallen is a "registrant" and that the WIPO panel ordered his domain name transferred. The transfer was under a "policy" as defined by § 1114(2)(D)(ii)(II). That is, his domain name was transferred by NSI, pursuant to its policy, stated in the UDRP, *see* UDRP ¶ 4(k), of cancelling or transferring domain names found by a dispute resolution panel to be confusingly similar to others' trademarks.

The analysis is not as simple under the Constitution. The question here is whether Congress has extended the federal courts' jurisdiction beyond Article III's limits by providing a cause of action to individuals such as Sallen. Article III states that "[t]he judicial Power shall extend to all Cases . . . arising under this Constitution, the Laws of the United States, and Treaties made . . . under their Authority." U.S. Const. art. III, § 2, cl. 1. Article III acts as a ceiling: Congress may confer federal jurisdiction up to Article III's limits, but not beyond. *Osborn,* 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204. Although *Osborn* "reflects a broad conception of 'arising under' jurisdiction," *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 492, 103 S.Ct. 1962, 76 L.Ed.2d. 81 (1983), Congress may not extend that jurisdiction to decide federal questions that are not Article III "Cases." The "triad of injury in fact, causation, and redressability comprises the core of Article III's case-or-controversy requirement, and the party invoking federal

jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103-04, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (footnote omitted).

If § 1114(2)(D)(v) were read to permit federal jurisdiction in instances where no Article III case or controversy exists, then the statute would run afoul of the Constitution. But we do not read § 1114(2)(D)(v) as granting federal jurisdiction over mere abstract claims of federal right where no Article III case exists. Although CL has stated that it has no intent to sue Sallen under the ACPA for his past actions related to corinthians.com, there is indeed a controversy between Sallen and CL: Sallen asserts that he has rights to corinthians.com and CL asserts that it has mutually exclusive rights to the same domain name. Since the dismissal of Sallen's complaint, the corinthians.com domain name has been transferred to CL and is now being used to promote the Corinthians soccer team. Sallen asserts that the domain name belongs to him.

CL claims that a reasonable apprehension of suit is required to meet Article III's case or controversy requirement. But this is not the only way to establish the existence of a case for purposes of Article III. The reasonable apprehension of suit doctrine exists to cabin declaratory judgment actions where the only controversy surrounds a potential, future lawsuit. *E.g., Biogen, Inc. v. Amgen, Inc.,* 913 F.Supp. 35 (D.Mass. 1996) (holding no case or controversy exists when a party brings a declaratory judgment action to declare patents invalid and the declaratory defendant promises never to sue on the patents in the

future); *Super Sack Mfg. Corp. v. Chase Packaging Corp.,* 57 F.3d 1054, 1058-60 (Fed. Cir. 1995) (same). That is not this case.

Here, Sallen has already had transferred from him a domain name, to which he claims to have legitimate rights, in an international dispute resolution proceeding. At the time Sallen filed his complaint, the dispute had already progressed far beyond those cases in which a declaratory defendant only questionably threatened suit. Sallen had been brought before a WIPO panel, the panel had found him in violation of the UDRP's cybersquatting provision, and the panel had ordered the disputed domain name transferred to CL. Sallen objected to all of this. As other courts have noted, a certain controversy renders the "reasonable apprehension" question irrelevant. *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed. Cir. 1988); *Waters Corp. v. Hewlett-Packard Co.,* 999 F.Supp. 167, 171 (D.Mass. 1998).

According to CL, regardless of any UDRP dispute between it and Sallen, there is no dispute under the ACPA. But this assumes that a declaration of compliance with the ACPA is only relevant to defend against a potential lawsuit under that very statute and that a declaration of Sallen's compliance with the ACPA could not redress his UDRP defeat. This assumption is incorrect. Section 1114(2)(D)(v) provides a registrant who has lost a domain name under the UDRP with a cause of action for an injunction returning the domain name if the registrant can show that she is in compliance with the ACPA. A declaration of Sallen's compliance with the ACPA would redress his loss of corinthians.com in the UDRP proceeding.

11

First, the UDRP clearly contemplates judicial intervention and, in fact, that the judicial

outcome will override the UDRP one. *See* UDRP ¶ 4(k) (stating that UDRP

proceedings shall not prevent either party from "submitting the dispute to a court of

competent jurisdiction for independent resolution"); World Intellectual Property

organization, *The Management of Internet Names and Addresses: Intellectual Property*

*Issues: Final Report of the WIPO Internet Domain Name Process* ¶ 150(v), *at*

http://wipo2.wipo.int/process1/report/finalreport.html (Apr. 30, 1999) [hereinafter *First*

*WIPO Report*] (stating that UDRP administrative dispute resolution procedures "should

not have (and cannot have) the effect of binding precedent in national courts"); *id.* at ¶

196(v) (stating that "[a] decision by a court of competent jurisdiction, that is contrary to

a determination resulting from the administrative procedure should . . . override the

administrative determination").

This is how the UDRP has been interpreted. *BroadBridge Media, L.L.C. v.*

*Hypercd.com,* 106 F.Supp.2d 505, 508-09 (S.D.N.Y. 2000) (concluding that a plaintiff

that has filed an ICANN administrative proceeding may, before, during, and after filing

such a proceeding, bring an action in federal court); *Weber-Stephen Prods. Co. v.*

*Armitage Hardware Bldg. Supply, Inc.,* No. 00 C 1738, 2000 WL 562470, at *1-2

(N.D.Ill. May 3, 2000) (concluding that "the ICANN Policy and its accompanying rules

do contemplate the possibility of parallel proceedings in federal court" and that federal

courts are "not bound by the outcome of the ICANN administrative proceedings");

*Parisi,* 139 F.Supp.2d at 746, 751-52 (concluding that UDRP proceedings should not

receive the significant deference accorded to arbitration under the Federal Arbitration
Act).

The ability of the parties to a UDRP proceeding to seek independent resolution of the
issues was part of the compromise codified in the UDRP. *See* UDRP ¶ 4(k); *First WIPO
Report, supra,* at ¶¶ 139-140 (recommending, with the approval of "virtually all
commentators," that the UDRP "not deny the parties to the dispute access to court
litigation"); *id.* at ¶¶ 139, 150(iv) (noting that parties should be able to seek "de novo
review" of UDRP administrative dispute resolution). Because the UDRP explicitly
contemplates independent review in national courts, the cause of action Sallen seeks to
assert is consistent with the UDRP's structure.

Since the UDRP cannot confer federal jurisdiction where none exists, the remaining
question is whether Congress has, in fact, provided a cause of action to override UDRP
decisions. Under § 1114(2)(D)(v), Congress has provided registrants such as Sallen
with an affirmative cause of action to recover domain names lost in UDRP proceedings.
The statute clearly states that a registrant whose domain name has been "suspended,
disabled, or transferred" may sue for a declaration that the registrant is not in violation
of the Act and for an injunction returning the domain name. 15 U.S.C. § 1114(2)(D)(v).
Sallen is a registrant. His domain name has been transferred. Now he simply seeks the
declaration and injunction that the statutory provision makes available. Congress's
authorization of the federal courts to "grant injunctive relief to the domain name
registrant, including the reactivation of the domain name or transfer of the domain

name to the domain name registrant," provides Sallen with an explicit cause of action to redress his loss of corinthians.com under the UDRP. *Cf. PHC, Inc. v. Pioneer Healthcare, Inc.* 75 F.3d 75, 79 (1st Cir. 1996) (holding that federal jurisdiction clearly exists over plaintiff's request for a declaration that it was not violating defendant's trademark rights and that it was entitled to maintain its trademark registration).

That a declaration of compliance with the ACPA trumps the panel's finding of noncompliance with the UDRP is further supported by the overlap between the two provisions. In the WIPO proceeding, the panel found that corinthians.com was confusingly similar to CL's trademark, that Sallen had no rights or legitimate interests in corinthians.com, and that the domain name was registered and being used in bad faith. Sallen argues that, under U.S. law, none of these claims is legally supported.

Although CL recognizes overlap between the UDRP and the ACPA, it argues that WIPO proceedings determine whether a registrant's use of a domain name is in accordance with the UDRP, not whether there has been a violation of a U.S. law. But a WIPO panel's application of the UDRP requires it to resolve issues of U.S. law in some cases and, in these cases, a federal court's declaration of a UDRP participant's rights directly impacts the decision issued by the WIPO panel. For instance, the panel found that Sallen had "no rights to or legitimate interests in the domain name at issue." The panel concluded that publishing quotes from the Bible before CL filed its complaint but after Sallen had notice that there was a dispute brewing was insufficient to constitute a right or legitimate interest. A finding by a federal court that Sallen was within his rights

14

when he used corinthians.com to post Biblical quotes would directly undercut the panel's conclusion.

Similarly, the panel, taking into consideration Sallen's "lack of rights or interests in the domain name," found that Sallen had registered and used corinthians.com in bad faith. Again, Sallen asserts that he had no bad faith intent because he believed, and had reasonable grounds to believe, that his use of corinthians.com was fair or otherwise lawful under 15 U.S.C. § 1125(d)(1)(B)(ii). A finding by a federal court that Sallen was within his rights would necessarily undermine the panel's conclusion that he used the domain name in bad faith.

More generally, a court's § 1114(2)(D)(v) decision that a party is not a cybersquatter under the ACPA, and that a party has a right to use a domain name, necessarily negates a WIPO decision that a party is a cybersquatter under the UDRP. The conclusion that a federal court's interpretation of the ACPA supplants a WIPO panel's interpretation of the UDRP is further reinforced by the fact that WIPO does not create new law — it applies existing law. In fact, the application of the "lowest common denominator of internationally agreed and accepted principles concerning the abuse of trademarks," rather than the creation of new law, is part of the UDRP's fundamental structure. *See Second WIPO Report, supra,* at ¶ 66.

CL claims that it does not contest any of Sallen's ACPA cybersquatting arguments, but instead defends WIPO's decision that Sallen violated the UDRP's contractual prohibition on cybersquatting. As CL understands the law, Sallen has waived his rights

15

under the ACPA by agreeing to different standards under the UDRP. But §
1114(2)(D)(v) provides disappointed administrative dispute resolution participants with
a chance to have *any* unfavorable UDRP decision reviewed in a U.S. court. We think
this provision means that a federal court's decision that Sallen was in compliance with
the ACPA necessarily contradicts the WIPO panel's finding that Sallen lacked a
legitimate interest in corinthians.com. Congress has defined in the ACPA what it means
to lack a legitimate interest in a domain name under U.S. law. For that reason, should a
federal court declare that Sallen is in compliance with the ACPA, that declaration would
undercut the rationale of the WIPO panel decision.

We would not lightly assume that Congress enacted the ACPA, but intended all domain
name registrants to be governed by a different standard, administered by international
dispute resolution panels, with no eventual recourse to whatever affirmative protections
the U.S. law might provide. A contextual understanding of § 1114(2)(D)(v) supports
reading the provision to include complaints such as Sallen's. Section 1114(2) addresses
limitations on liability of potential defendants in trademark infringement actions.
Section 1114(2)(A) creates the "innocent infringer" exception and § 1114(2)(B) creates
a limitation on liability of advertisers. Section 1114(2)(D), added to the Lanham Act by
the ACPA, creates, among other things, an exception to liability for domain name
registrars that transfer or revoke domain names from registrants pursuant to a policy by
the registrar prohibiting registration of domain names that are "identical to, confusingly
similar to, or dilutive of another's mark." § 1114(2)(D)(ii)(II). Section 1114(2)(D)(ii)(I)
also creates an exception to liability for domain name registrars that transfer or revoke

16

domain names from registrants pursuant to a court order. The purpose of subsections

(D)(i)-(ii) is "to encourage domain name registrars . . . to work with trademark owners

to prevent cybersquatting through a limited exemption from liability for domain name

registrars . . . that suspend, cancel, or transfer domain names pursuant to a court order

or in the implementation of a reasonable policy prohibiting cybersquatting." H.R. Conf.

Rep. No. 106-464, at 116 (1999); *see also* H.R. Rep. No. 106-412, at 15. Subsections

(D)(i)-(ii) are, on this reading, quite favorable to trademark holders because they

encourage domain name registrars to cooperate with trademark holders' attempts to

assert their trademark rights.

Subsection (D)(iv) then provides that if a registrar suspends or transfers a registrant's

domain name based on a knowing misrepresentation by another person that "a domain

name is identical to, confusingly similar to, or dilutive of a mark," then the person

making the misrepresentation is liable to the registrant. This provision states that "[t]he

court may also grant injunctive relief to the domain name registrant, including the

reactivation of the domain name or transfer of the domain name to the domain name

registrant." This subsection, in contrast to subsections (D)(i)(ii), "protects the rights of

domain name registrants against overreaching trademark owners." H.R. Conf. Rep. No.

106-464, at 117. Although subsections (D)(i)(ii) encourage enforcement of policies

against cybersquatting by facilitating cooperation between registrars and trademark

owners, subsection (D)(iv) provides a counterweight to ensure that this cooperation

does not result in reverse domain name hijacking, whereby trademark holders abuse

anti-cybersquatting provisions to take domain names from rightful, noninfringing
registrants.

Subsection (D)(v), similar to subsection (D)(iv), also acts as a counterweight to offset
potential overreaching by trademark holders. Subsection (D)(v) was viewed as an
"additional protection" to subsection (D)(iv), designed to aid registrants who lose their
domain names to overzealous trademark holders. *Id.* The similarity of subsections
(D)(iv) and (v) is reinforced by their parallel structure. They use the exact same
language, stating that "[t]he court may grant injunctive relief to the domain name
registrant, including the reactivation of the domain name or transfer of the domain
name to the domain name registrant." Viewed in context, and with the structure of the
statute in mind, subsection (D)(v) is best understood to provide domain name holders
with a cause of action to rectify reverse domain name hijacking by trademark holders
using the UDRP process to require registrants to transfer domain names originally held
by rightful users under U.S. law.

The legislative history also supports the proposition that § 1114(2)(D)(v) was intended
to provide registrants in Sallen's position with a cause of action. Senator Hatch,
discussing § 1114(2)(D)(v), which he offered as an amendment to the bill that was
enacted as the ACPA, explained that

a domain name registrant whose name is suspended in an extra-judicial dispute
resolution procedure can seek a declaratory judgment that his use of the name was, in
fact, lawful under the Trademark Act. This clarification is consistent with other

provisions of the reported bill that seek to protect domain name registrants against
overreaching trademark owners.

145 Cong. Rec. S10,516 (1999). This provision, along with others added by the
Hatch-Leahy amendments, was understood by Senator Hatch to "balance the rights of
trademark owners with the interests of Internet users" and to "preserv[e] the rights of
Internet users to engage in protected expression online and to make lawful uses of
others' trademarks in cyberspace." *Id.* at S10,515. Subsection (D)(v) is best understood
as creating a protection for registrants to counteract abusive behavior by trademark
holders. And this abusive behavior is best understood to include administrative dispute
resolution proceedings under the UDRP where those proceedings are intended, as
Sallen has asserted, to strip a domain name from a registrant who has lawfully
registered and used that domain name.

*Sallen v Corinthians Licenciamentos LTDA*, 273 F3d 14, 23-30 [1st Cir 2001]


//

//

For the foregoing reasons, Michaels asks the court to find that it has subject matter jurisdiction over the case.

Respectfully submitted

Sept 1, 2023

DAVID MICHAELS

By: <u>s/ David Michaels</u>
Pro Se

17 Phelps Drive
Brampton ON L6X 3V8 Canada
416-239-1361
david@davidmichaels.org